[Cite as *State v. Mott*, 2022-Ohio-2894.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 2021-CA-63 |
| | : | |
| v. | : | Trial Court Case No. 2018-CR-630 |
| | : | |
| JACOB MOTT | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 19th day of August, 2022.

. . . . . . . . . . .

IAN A. RICHARDSON, Atty. Reg. No. 0100124, Assistant Prosecuting Attorney, Clark County Prosecutor's Office, 50 East Columbia Street, Suite 449, Springfield, Ohio 45502
        Attorney for Plaintiff-Appellee

CATHERINE H. BREAULT, Atty. Reg. No. 0098433 and JON PAUL RION, Atty. Reg. No. 0067020, 130 West Second Street, Suite 2150, Dayton, Ohio 45402
        Attorneys for Defendant-Appellant

. . . . . . . . . . . .

TUCKER, P.J.

{¶ 1} Jacob Mott appeals from the trial court's denial of his R.C. 2953.21 petition for post-conviction relief.

{¶ 2} Mott contends the trial court erred in finding an ineffective-assistance-of-counsel claim in his petition to be barred by res judicata. He also asserts that the trial court's one-sentence entry denying his petition lacked independent analysis and failed to address two affidavits accompanying the petition. Finally, he argues that the trial court failed to give due deference to the supporting affidavits and that it should have held an evidentiary hearing.

{¶ 3} We agree that the doctrine of res judicata did not bar Mott's ineffective-assistance-of-counsel claim. With regard to the other issues, the trial court's one-sentence entry incorporated by reference the State's memorandum opposing Mott's petition. But that memorandum lacked adequate analysis of Mott's affidavits and the ineffective-assistance issue to support denial of the petition without a hearing and to enable appellate review. Accordingly, the trial court's judgment will be reversed, and the case will be remanded for further proceedings.

**I. Background**

{¶ 4} In 2019, a jury found Mott guilty of felonious assault with a firearm specification. The trial court imposed an aggregate nine-year prison term. This court affirmed on direct appeal. The evidence underlying the jury's verdict was summarized in our 2020 opinion as follows:

The incident which formed the basis for Mott's conviction occurred in

the early morning hours of September 16, 2018, when the victim, Cody Riley, was out with friends visiting local bars in Springfield, Ohio. The group of men, including Riley, eventually went to a bar named Che's Rustic Lounge on Bechtel Avenue in Springfield. At Che's, Riley came into contact with Mott. Although the two men had not seen each other in years, Riley and Mott were engaged in an ongoing dispute dating back to their time in high school. The dispute involved money, stolen drugs, and a pair of expensive sneakers.

Riley testified that, prior to last call at the bar, Mott approached him and asked him, "How's it going, buddy?" Tr. 102. Riley testified that he informed Mott that they were not friends and to leave him alone. Mott left at that point, but approximately 15 minutes later, he returned and asked Riley to buy him a beer. Riley refused, and the two men then engaged in a verbal altercation with Mott demanding that they fight. Although disputed by Mott, Riley testified that they were subsequently thrown out of the bar.

After being ejected from the bar, Mott invited Riley to meet him at his house so they could fight. Mott then sent Riley a text message containing the address of his residence in Springfield. Traveling in two vehicles, Riley and his friends drove to the address provided by Mott and parked down the street a short distance from Mott's residence. Mott testified that the two vehicles containing Riley and his friends were parked at the end of his driveway. Shortly after Riley arrived, Mott arrived in a vehicle driven by his

ex-girlfriend, Megan Hawk, who parked the car in Mott's driveway. Mott alleges that another individual, Dillon Peterson, was present in the vehicle with him and Hawk. As soon as Mott exited the vehicle, Hawk backed the vehicle out of the driveway and drove away from the scene. At trial, Mott testified that Hawk did not drive away as he earlier told police, but that she and Peterson remained in the parked vehicle in his driveway during the subsequent events.

In his interview with police, Mott stated that after he exited the vehicle, he went inside his house, retrieved a .38 caliber revolver, and walked back outside to confront Riley. At trial, however, Mott testified that he never went back into his house to retrieve the revolver. Rather, he testified that before exiting the vehicle driven by Hawk, he retrieved the revolver from the glove box inside the vehicle and then got out and walked towards Riley, who was standing at the end of the driveway unarmed. Riley testified that Mott had pulled the hammer back on the revolver as he approached. Mott then pointed the revolver at Riley's head stating, "You don't think I'll do it." Tr. 109. At that point, Mott began tapping the barrel of the revolver against Riley's forehead, backing him up toward the street. Fearing for his life, Riley attempted to take the gun away from Mott, but was unable to do so. Mott then backed up a step and shot Riley in the abdomen. The round fired by Mott was later found to have pierced Riley's abdomen, passed through his gall bladder and large intestine, and lodged itself in

Riley's right buttock. At trial, Mott testified that he did not intentionally shoot Riley in the abdomen. Rather, Mott claimed that as he and Riley were struggling for control of the revolver, the two men fell to the ground, and the gun went off accidentally.

One of Riley's friends, Derrick Delawder, exited his vehicle, picked Riley up where he was lying in the grass next to Mott's driveway, and transported him to Springfield Regional Medical Center. Delawder testified that he observed Riley try unsuccessfully to take the gun from Mott. Delawder testified that he then observed Mott step back, aim the revolver at Riley's torso, and shoot him in the abdomen, contrary to Mott's testimony that the gun accidentally discharged during a struggle.

Riley was eventually flown by Care Flight helicopter to Miami Valley Hospital where he received emergency surgery. Riley survived the surgery, but doctors were forced to remove his gall bladder and a section of his large intestine. At the time of the trial, the bullet still remained lodged in Riley's right buttock. After shooting Riley, Mott walked back to his house and went inside; he was located there when the police arrived. Mott was arrested and taken into custody. The revolver used in the shooting was later recovered by the police in a ravine in the woods near Mott's residence.

*State v. Mott*, 2d Dist. Clark No. 2019-CA-41, 2020-Ohio-598, ¶ 2-7.

**{¶ 5}** In affirming Mott's conviction, we overruled three assignments of error. One of those alleged ineffective assistance of Mott's trial counsel for failing to subpoena Dillon

Peterson and Megan Hawk. We found this assignment of error speculative because we had no way of knowing whether defense counsel had interviewed these potential witnesses or what they would have said if they had testified. *Id.* at ¶ 15. We noted that Mott's argument required evidence outside the record, making a petition for post-conviction relief the proper avenue for raising the issue. *Id.*

{¶ 6} Mott subsequently filed his post-conviction-relief petition. Accompanying the petition were affidavits from Peterson and Hawk. With regard to the shooting that occurred outside Mott's residence, Peterson averred as follows:

15. I was the first to exit Mr. Mott's vehicle, from the back seat.

16. Mr. Mott followed, as the six occupants of the vehicle approached us.

17. The only person I could identify from the group of six individuals was Cody Riley.

18. I could identify Mr. Riley because I have seen him, hung out with him before, and recognized him from earlier in the evening.

19. Mr. Mott walked around the front of the vehicle, passes me, and has a firearm in his hand, at his side.

20. I was standing approximately one to two feet behind Mr. Mott on his left side, behind him.

21. Mr. Mott stands in the driveway and I personally heard Mr. Mott tell the group of individuals to leave.

22. Mr. Mott displayed the firearm to the group of individuals when they did not leave.

23. All the individuals, with the exception of Cody Riley, got back in the two vehicles.

24. At this time, Mr. Mott turned around to walk back towards the house[.]

25. I personally witnessed Cody Riley then run towards Mr. Mott and hit or attempt to hit him in the back of the head.

26. As I witnessed this, I verbally warned Mr. Mott that Mr. Riley was attacking. I yelled "watch out."

27. Mr. Mott turned around and then Mr. Mott and Mr. Riley started to physically struggle over control of the gun.

28. From my observations, being approximately three to four feet away, under motion activated flood lights, I observed the firearm to be at waist level.

29. This struggle lasted about thirty seconds.

30. During the struggle, Mr. Riley was edging backwards, across the street, while struggling to grab the firearm.

31. Mr. Mott and Mr. Riley then fall onto the hood of the rear vehicle parked across the street.

32. Both of them then roll off the hood, onto the ground, and the firearm discharged when both persons hit the ground.

33. One single shot went off.

34. The shot was very muffled and sounded like a bebe [sic] gun.

35. When the firearm went off, Mr. Riley was on top of Mr. Mott.

36. Mr. Riley then left with one of the individuals in the car.

37. Mr. Mott then walks back towards the house and told Megan Hawk to leave with his car.

38. I never witnessed Mr. Mott aim the firearm at any individual that evening.

39. Griff Nowicki, Mr. Mott's attorney, never spoke to me or interviewed me.

40. The police interviewed me on the night of the shooting.

41. Fearful of being around a firearm, I lied and said I did not witness anything because I was a convicted felon.

42. I tried to contact the public defender's office several times.

43. I left a message with a secretary to inform them of my knowledge and never received a call back.

44. I even emailed the public defender's office regarding Mr. Mott's case to make myself available.

45. I was never subpoenaed by Mr. Mott's attorney.

46. I was never interviewed by Mr. Mott's attorney.

47. I was available at the time of trial, and I would have testified on Mr. Mott's behalf.

May 28, 2020 Petition for Post-Conviction Relief at Exh. A.

**{¶ 7}** In her affidavit, Hawk provided the following statement regarding what occurred at Mott's house:

7. We arrived at Jacob's house at 2630 am, two (2) cars pulled up in front of Jacob's house, several guys got out, one of those guys was Cody Riley. Cody took off his shirt and started yelling.

8. Jacob took a gun out of the glove compartment of his car and told me to get inside of the house. Dillon Peterson and Jacob got out of the car and started walking to the group of guys. I shouted that I was going to call the police. I went inside to Jacob's room and tried to find my phone[.] [T]he window was open and I heard Jacob yell that everyone needed to leave, [and] after a minute or two, I heard a loud bang.

9. I immediately looked out of the window and saw Dillon Peterson by the front of the car and Jacob getting up off of the ground. Both cars started to leave the house. Jacob and Dillon both started walking towards the house as I was running outside to see what had happened. All three of us went inside of the house at that time.

10. Jacob was upset and told me that he thought that Cody Riley may have gotten shot. Dillon Peterson started running in and out of the house and slamming doors. I told Jacob that I was worried those guys would come back to the house. Jacob told me that I could take his car home since I didn't have mine with me and so I wouldn't get hurt. I started to grab my purse when I noticed that Jacob's mother had gotten out of bed to see what was going on.

11. Jacob was trying to tell his mom, Billie Joe Mott[,] what had happened when I was leaving at 2655 am. I walked out of the house and had to step over the gun that was at the bottom of the stairs. I took Jacob's car and left[.] I called Jacob at 2658 am and overheard his mom still trying to console

him because he was so upset. At the time of the phone call, I did not hear

Dillon Peterson. Jacob said that he had another call coming in and put me

on hold. I waited for several minutes and tried calling back but the phone

had been turned off at that time.

*Id.* at Exh. B.

{¶ 8} In his post-conviction-relief petition, Mott alleged ineffective assistance of counsel based on his trial attorney's failure to interview Peterson and Hawk, subpoena them to testify, and call them as defense witnesses. Mott claimed that defense counsel had listed Peterson and Hawk on his witness list but never spoke with either of them. He argued that Peterson and Hawk were the only two people who could corroborate his version of events. Mott's petition included a request for an evidentiary hearing.

{¶ 9} On September 20, 2021, Mott sought a status conference on his petition, which had been pending for approximately 16 months. On November 5, 2021, the State filed a memorandum opposing the petition. The State argued that Mott's post-conviction claim was barred by res judicata and that it failed on the merits. Seven days later, the trial court filed a one-sentence entry denying Mott's petition "[f]or the reasons set forth in the State's response[.]" It then denied the request for a status conference.

## II. Analysis

{¶ 10} A petition for "postconviction relief is a means by which the petitioner may present constitutional issues to the court that would otherwise be impossible to review because the evidence supporting those issues is not contained in the record of the petitioner's criminal conviction." (Citations omitted.) *State v. Monroe*, 2015-Ohio-844, 29

N.E.3d 391, ¶ 37 (10th Dist.). A post-conviction proceeding is not an appeal of a criminal conviction. It is a collateral civil attack on a criminal judgment. *Id.* The statute governing post-conviction relief permits "[a]ny person who has been convicted of a criminal offense * * * who claims that there was such a denial or infringement of the person's rights as to render the judgment void or voidable under the Ohio Constitution or the Constitution of the United States * * * [to] file a petition in the court that imposed sentence, stating the grounds for relief relied upon, and asking the court to vacate or set aside the judgment or sentence or to grant other appropriate relief." R.C. 2953.21(A)(1)(a)(i). The petitioner may file a supporting affidavit and other documentary evidence in support of the claim for relief. R.C. 2953.21(A)(1)(b).

{¶ 11} A petitioner who challenges his conviction by seeking post-conviction relief is not automatically entitled to a hearing. *State v. Calhoun*, 86 Ohio St.3d 279, 282, 714 N.E.2d 905 (1999). Instead, "a trial court has a gatekeeping role as to whether a defendant will even receive a hearing." *State v. Gondor*, 112 Ohio St.3d 377, 2006-Ohio-6679, 860 N.E.2d 77, ¶ 51. Before granting an evidentiary hearing on a petition, a trial court shall determine whether there are substantive grounds for relief. *State v. Perry*, 2016-Ohio-4582, 66 N.E.3d 1109, ¶ 24 (2d Dist.). A petitioner has the initial burden to provide evidence containing sufficient operative facts to demonstrate a cognizable claim of constitutional error. *State v. Kapper*, 5 Ohio St.3d 36, 37-38, 448 N.E.2d 823 (1983). In determining whether there are grounds for such relief, a trial court is required to consider the petition and any supporting affidavits. R.C. 2953.21(D). We review a trial court's decision for an abuse of discretion. *Gondor* at ¶ 51-52, citing *Calhoun* at 286.

## A. Res Judicata

{¶ 12} In his first assignment of error, Mott contends the trial court erred in finding his ineffective-assistance-of-counsel claim barred by res judicata. He asserts that res judicata does not apply because his claim relies on evidence outside the trial record, namely affidavits from Peterson and Hawk.

{¶ 13} For its part, the State argues that res judicata does apply. The State notes that Mott argued ineffective assistance of counsel on direct appeal based on his trial attorney's failure to call Peterson and Hawk as witnesses. Because Mott raised that issue on direct appeal, the State maintains that res judicata precludes him from asserting it again in a petition for post-conviction relief.

{¶ 14} Upon review, we conclude that the trial court erred in finding Mott's ineffective-assistance claim barred by res judicata. On direct appeal, Mott did attempt to raise his attorney's failure to call Peterson and Hawk as witnesses. We rejected his argument because it required evidence outside the record. We specifically stated that a post-conviction-relief petition was the proper avenue for Mott to seek relief.

{¶ 15} In *State v. Smith*, 17 Ohio St.3d 98, 477 N.E.2d 1128 (1985), the Ohio Supreme Court held that a defendant could pursue post-conviction relief based on ineffective assistance of counsel despite the fact that he had raised the issue on direct appeal. In reaching its conclusion, the Ohio Supreme Court reasoned: "[I]t is possible that the issue of competency herein could not fairly have been determined without resort to evidence dehors the record. * * * Under these circumstances, res judicata may not be a bar to postconviction relief." *Id.* at 1131, fn. 1.

{¶ 16} We reach the same conclusion here. Although Mott raised ineffective assistance of counsel on direct appeal, we noted our inability to determine the issue absent evidence outside the record. Mott responded by filing a petition providing such evidence in the form of affidavits from Peterson and Hawk. Under these circumstances, res judicata did not apply. Mott's first assignment of error is sustained.

## B. Adequacy of Trial Court's Entry

{¶ 17} In his second assignment of error, Mott challenges the adequacy of the trial court's one-sentence entry denying his petition. He notes that the trial court's entry contained no analysis and failed to address the claim in his petition or the supporting affidavits.

{¶ 18} We agree that a one-sentence entry, standing alone, would be inadequate to support denying a petition for post-conviction relief. Under R.C. 2953.21(H), if a trial court "does not find grounds for granting relief, it shall make and file findings of fact and conclusions of law and shall enter judgment denying relief on the petition." Here the trial court's entry denying Mott's petition lacked any findings. Notably, however, it denied the petition "[f]or the reasons set forth in the State's response[.]"

{¶ 19} In essence, the trial court adopted by reference the State's opposing memorandum. Although such a practice is less helpful than an actual decision by the trial court containing its own findings of fact and conclusions of law, Mott has not identified anything prohibiting what the trial court did. The issue becomes the adequacy of the State's memorandum to support dismissal of Mott's petition. We will address this issue under the third assignment of error. Mott's second assignment of error is overruled.

### C. Deference to Affidavits and Credibility Assessment

{¶ 20} In his third assignment of error, Mott contends the trial court erred in failing to give due deference to the affidavits of two eyewitnesses, Peterson and Hawk, who largely corroborated his version of events. While acknowledging that a trial court has some discretion to assess the credibility of affidavits supporting a post-conviction-relief petition, Mott claims the trial court failed to engage in such an analysis.

{¶ 21} In response, the State argues that the trial court gave proper weight to the affidavits and properly assessed their credibility without holding an evidentiary hearing. The State claims the affidavits from Peterson and Hawk failed to make clear where they were located during the shooting. The State also asserts that Peterson's affidavit is inconsistent with Mott's trial testimony and that Hawk's affidavit reveals she did not even witness the shooting.

{¶ 22} Having examined the State's memorandum opposing Mott's petition, we find it insufficient to support denying Mott's petition without an evidentiary hearing. As an initial matter, we cannot ignore the context in which the trial court adopted the State's memorandum. More than one year after filing his petition, Mott sought a status conference on it. In response to that request, the State filed an extremely tardy memorandum in opposition to the petition. Just seven days later, the trial court denied Mott's petition in a one-sentence ruling "[f]or the reasons set forth in the State's response." As noted above, the State's first and primary rationale for denying the petition was res judicata, which plainly had no applicability.

{¶ 23} As for the merits of Mott's petition and supporting affidavits, the State's

memorandum contained little analysis. Although a trial court has some discretion to assess the credibility of post-conviction affidavits without a hearing, the State's analysis did not even mention the word "credibility." Although the State did make cursory references to the "reliability" of Peterson and Hawk, its memorandum in opposition to the petition failed to address or even mention any of the multiple factors identified by the Ohio Supreme Court in *Calhoun* as being relevant to the credibility of post-conviction affidavits.

{¶ 24} In its memorandum opposing Mott's petition, the State suggested that the two affidavits were unreliable or at least unhelpful because they failed to make clear where Peterson and Hawk were located during the shooting. But Peterson's affidavit unambiguously stated that he "was standing one to two feet behind Defendant on his left side, behind him." For her part, Hawk averred that she was inside the house when she heard the gunshot.

{¶ 25} At trial, Mott testified that he had instructed Peterson and Hawk to wait in his car before the shooting occurred. Trial Tr. at 232. That instruction, however, is not necessarily inconsistent with Peterson's averment that he was behind Mott at the time of the shooting or Hawk's averment that she was in the house. It remains possible that Peterson and Hawk disregarded Mott's instruction, that Peterson in fact was behind Mott, and that Mott did not see Peterson because he was preoccupied with Riley. Later in his trial testimony Mott acknowledged that Peterson and Hawk in fact did not wait in his car. He recalled that Hawk "got in [his] car and drove off" after the shooting and that Peterson was "standing around [him]." *Id.* at 234.

{¶ 26} The State also suggested in its memorandum opposing the petition that

Mott's trial testimony conflicted with Peterson's affidavit, making the affidavit unreliable. Specifically, Mott testified at trial that Riley tackled him after Mott heard a car door shut and "glance[d] back." *Id.* at 233. Peterson averred that Riley ran toward Mott and hit or attempted to hit him in the head as Peterson yelled "watch out." It may be, however, that Riley's act of tackling Mott included an attempt to hit him in the head. It also may be that Peterson did yell "watch out" and that Mott either did not hear him or simply did not mention the verbal warning in his trial testimony. Notably, Mott did not deny at trial that Peterson yelled for him to watch out.

{¶ 27} Finally, the State's memorandum opposing Mott's petition noted Peterson's felony record and suggested that defense counsel declined to call Peterson as a witness based on that record. Nothing before us, however, explains why defense counsel declined to call Peterson, who according to his affidavit would have provided testimony largely supporting Mott's version of key events.

{¶ 28} We do not suggest that the affidavits from Peterson and Hawk necessarily were credible or that they necessarily entitled Mott to a new trial or even to a hearing on his petition. One or more of the *Calhoun* factors may apply and cause the trial court to discount the credibility of the supporting affidavits. In our view, however, the State's memorandum, which the trial court adopted by reference, contained insufficient findings and analysis for the trial court to discount the affidavits and deny Mott's petition or for us to conduct meaningful appellate review. In the absence of such analysis, the trial court abused its discretion by effectively entering summary judgment in favor of the State without holding a hearing on the petition.

{¶ 29} Where a trial court denies post-conviction relief without conducting a sufficient credibility analysis and explaining its decision in a way that permits appellate review, the proper remedy is to reverse the judgment and to remand the case for further evaluation and analysis with an evidentiary hearing, if necessary. *State v. Thompson*, 2d Dist. Montgomery No. 27924, 2018-Ohio-4689, ¶ 14-17, 27; *State v. Henry*, 2017-Ohio-7427, 96 N.E.3d 1139, ¶ 21-24 (2d Dist.). We find that to be the appropriate remedy here. Accordingly, Mott's third assignment of error is sustained.

### III. Conclusion

{¶ 30} For the reasons set forth above, we sustain Mott's first assignment of error challenging the trial court's reliance on res judicata. We also sustain Mott's third assignment of error insofar as the trial court abused its discretion in failing to make sufficient findings regarding the affidavits provided by Peterson and Hawk.

{¶ 31} The trial court's judgment denying post-conviction relief is reversed, and the case is remanded. If the trial court determines that a hearing is not warranted, it should explain the basis of that determination in its judgment entry. If the trial court deems an affidavit to lack credibility, then its judgment entry should include an evaluation of the affidavit consistent with *Calhoun*.

. . . . . . . . . . . . .


WELBAUM, J. and EPLEY, J., concur.

Copies sent to:

Ian A. Richardson
Catherine H. Breault
Jon Paul Rion
Hon. Douglas M. Rastatter